# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD GLASS, | CASE NO. 1:04-cv-05953 AWI DLB PC |
| Plaintiff, | ORDER RE MOTION FOR RECONSIDERATION AND MOTION FOR EXTENSION OF TIME TO FILE REPLY |
| v. | |
| A. K. SCRIBNER, et al., | (Docs. 141, 144.) |
| Defendants. | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED IN PART AND DENIED IN PART |
| | (Doc. 94.) |
| | OBJECTIONS DUE WITHIN THIRTY (30) DAYS |

**Findings and Recommendations on Defendants' Motion for Summary Judgment**

## I.      Procedural History

Plaintiff Donald Glass ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on Plaintiff's complaint filed December 22, 2004, against defendants Bailey, Beebe, Botello, Bryant, Case, Dang, Diaz, Kraay, Lawton and Tracy.  (Doc. 16.)  On December 27, 2006, Defendants filed a motion for summary judgment.  (Doc. 94.)  After extensive discovery, an appeal filed by Plaintiff to the Ninth Circuit Court of Appeals, and two requests and grants to extend time, Plaintiff

///

///

1  filed his opposition on October 10, 2008.[1,2]  (Doc. 133.)  Defendants filed a reply on January 9,

2  2009.[3]  (Doc. 145.) On April 2, 2009, pursuant to the Court's order of February 4, 2009, Defendants

3  filed a supplement to their motion for summary judgment to include a videotape copy of the April

4  17, 2002 cell extraction. (Doc. 153.)  The motion is deemed submitted pursuant to Local Rule 78-

5  230(m).

6  **II.    Legal Standard**

7          Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

8  as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.

9  Civ. P. 56(c).  Under summary judgment practice, the moving party

10          [A]lways bears the initial responsibility of informing the district court
             of the basis for its motion, and identifying those portions of "the
11           pleadings, depositions, answers to interrogatories, and admissions on
             file, together with the affidavits, if any," which it believes
12           demonstrate the absence of a genuine issue of material fact.

13  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

14  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

15  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

16  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

17  motion, against a party who fails to make a showing sufficient to establish the existence of an

18  element essential to that party's case, and on which that party will bear the burden of proof at trial.

19  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

20  case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

21

22      [1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment  by
the court in an order filed on March 28, 2005. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Doc. 23.)

23

24      [2] Plaintiff's cross-motion for summary judgment is not considered by the Court because it was not timely
filed.  The deadline for filing dispositive motions was December 27, 2006.  (Doc. 75.)  Plaintiff did not seek an
extension of time to file a motion for summary judgment, which was filed nearly two years late.

25
        [3] On November 5, 2008, the Court granted Defendants' first motion to extend time to file their reply.
26  (Docs. 137, 138.)  Plaintiff filed a motion for reconsideration on December 5, 2008, arguing that he was not
permitted an opportunity to oppose the extension request.  (Doc. 141.)  Accordingly, Plaintiff's motion for
27  reconsideration is granted.
        Upon reconsideration, the Court finds good cause to grant the extension of time to defendants, and affirms
28  its earlier decision.  Good cause appearing, Defendants' second request to extend time, filed January 5, 2009, is also
granted.  (Doc. 144.)

1  should be granted, "so long as whatever is before the district court demonstrates that the standard

2  for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

3      If the moving party meets its initial responsibility, the burden then shifts to the opposing

4  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

5  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

6  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

7  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

8  material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586

9  n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

10  might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477

11  U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

12  (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

13  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

14  (9th Cir. 1987).

15      A verified complaint in a pro se civil rights action may constitute an opposing affidavit for

16  purposes of the summary judgment rule, where the complaint is based on an inmate's personal

17  knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833

18  F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir.

19  1985); Fed. R. Civ. P. 56(e). Plaintiff's complaint is verified and will be considered by the Court

20  in resolving Defendants' motion to the extent that it sets forth admissible facts. The parties bear the

21  burden of supporting their motions and oppositions with the papers they wish the Court to consider

22  and/or by specifically referencing any other portions of the record they wish the Court to consider.

23  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will

24  not undertake to mine the record for triable issues of fact. Id.

25  ///

26  ///

27  ///

28  ///

**III.     Defendants' Motion for Summary Judgment**[4]

    **A.     April 17, 2002 Incident**

        **i.     Summary of Plaintiff's Complaint**

On April 17, 2002 at approximately 19:30, Plaintiff and defendant Sgt. Lawton engaged in a verbal dispute over Plaintiff's grievance and litigation activity.  Defendant Lawton told Plaintiff to cease filing grievances or lawsuits, or he would confiscate Plaintiff's legal property and place Plaintiff on strip cell status.  (Doc. 134-2, Ex. 1, Comp., ¶18.)  During the exchange, defendant Lawton admitted to having intercepted Plaintiff's March 2002 grievance filed against him, defendant Sgt. Beebe and defendant Sgt. Tracy. (Id., ¶19.)  Plaintiff informed defendant Lawton that he intended to file another grievance concerning defendant Lawton's obstruction of his litigation activities. (Id., ¶20.) In response, defendant Lawton informed Plaintiff that he would accuse Plaintiff of covering his cell and would prepare a team to have Plaintiff cell extracted, in order to prevent Plaintiff from filing the grievance against him.  (Id., ¶21.) Defendant Lawton then conferred with defendants Beebe, Tracy and Lt. Diaz.  (Id., ¶23.)  Defendants Lawton, Beebe, Tracy and Diaz telephoned defendant Capt. Botello. (Id., ¶24.)  Defendant Botello authorized the cell extraction, the confiscation of Plaintiff's legal property and Plaintiff's placement on strip cell status.  (Id.)

At approximately 23:45 that evening, defendants Diaz, Beebe, Lawton and Botello approached Plaintiff's cell.  The defendants demanded that Plaintiff cuff up and allow them to confiscate his legal property, or they would use pepper spray.  (Id., ¶25.)  Because he had done nothing wrong and in order to protect himself, Plaintiff placed  a mattress in front of his body.  (Id., ¶26.)  Defendant Diaz ordered defendant Lawton to use "extremely large amounts" of pepper spray. (Id., ¶27.) Plaintiff immediately dropped the mattress and complied with defendant Diaz's orders by placing both hands/arms through the open cuff port. (Id., ¶28.) Defendants Diaz and Lawton refused to allow Plaintiff to cuff up.  (Id.) Instead, defendant Lawton continued to use pepper spray while defendants Botello, Beebe and Diaz watched in amusement. (Id., ¶29.)  Defendant Lawton then

---

[4] Because the parties agree on so little, this Findings and Recommendations (F&R) report does not include a summary of the parties' undisputed facts.  The facts that are undisputed are incorporated directly into the body of this F&R.

1  ordered Plaintiff to strip nude before he would allow Plaintiff to cuff up.  (Id., ¶30.) Defendant

2  Lawton used a fire extinguisher sized container of pepper spray to saturate Plaintiff's entire body and

3  still refused to allow Plaintiff to cuff up.  (Id., ¶30.)  Defendant Lawton ordered Plaintiff to run

4  around his cell while defendant used pepper spray, aiming at Plaintiff's groin area. (Id., ¶31.)

5  Plaintiff states that defendants Botello, Diaz and Beebe allowed defendant Lawton to do so for

6  another five minutes, and laughed.  (Id., ¶¶32, 33.) Plaintiff suffered burns on his genitals, arms, legs

7  and back. (Id., ¶34.)

8          **ii.     Defendants' Position**

9          Defendants argue that they are entitled to judgment on Plaintiff's excessive force claim

10  against them because defendants Botello, Diaz, Lawton, and Beebe did not use excessive force on

11  Plaintiff, and because defendant Tracy was not involved in the April 17, 2002 incident.

12          Defendants state that on April 17, 2002, at approximately 8:45 p.m., defendant Sgt. Lawton

13  went to speak with Plaintiff.  Plaintiff had put his hand into the extended food port in his cell door

14  when officers on the unit were handing out clothing. He refused to allow the officers to secure the

15  inner food port because he wanted a different pair of socks. (Doc. 95-1, Lawton Decl. ¶ 3; Doc. 95-7,

16  Defs.' Ex. A 014.) Inmates with a history of disruptive behavior are given extended food ports to

17  limit their ability to assault staff or engage in other kinds of disruptive behavior. The extended food

18  port extends approximately 18 to 20 inches from the cell door. (Doc. 95-1, Lawton Decl. ¶ 4.)

19  Defendant Lawton ordered Plaintiff to remove his hand from the food port so defendant Sgt. Lawton

20  could secure it. Plaintiff refused. (Doc. 95-1, Lawton Decl. ¶ 5; Doc. 95-7, Defs.' Ex. A 014.)

21  Defendant Lawton reported to his supervisor that Plaintiff's inner food port remained unsecured.

22  (Id.) At approximately 9:15 p.m., defendant Lawton received a call from Officer Orozco, the Control

23  Booth Operator in Plaintiff's housing unit. Officer Orozco reported that Plaintiff had covered his cell

24  windows and door and was refusing to remove the coverings. (Doc. 95-1, Lawton Decl. ¶ 6; Doc.

25  95-7, Defs.' Ex. A 014.)  Defendant Lawton went to Plaintiff's cell and ordered him to remove the

26  coverings. Plaintiff refused. He stated that he would continue to cover up his cell throughout the

27  night, and that he would "gas" staff if they came near his cell. (Id.)  Defendant Lawton contacted

28  defendant Beebe and directed him to operate a video camera while MTA Muro conducted a clinical

intervention. (Doc 95-1, Lawton Decl. ¶ 7; Doc. 95-7, Defs.' Ex. A 014.) After receiving medical clearance to use pepper spray, and at the instruction of defendant Diaz, at approximately 9:45 p.m., defendant Lawton assembled a calculated cell extraction team. (Doc 95-1, Lawton Decl. ¶ 8; Doc. 95-6, Diaz Decl. ¶¶ 7-8; Defs.' Ex. A 012, 014.) At approximately 9:55 p.m., MTA Muro completed his clinical intervention with Plaintiff. The clinical intervention was unsuccessful, and Plaintiff continued to refuse to comply with the orders given to him. (Doc 95-1, Lawton Decl. ¶ 9; Doc. 95-6, Diaz Decl. ¶ 9; Defs.' Ex. A 012, 014-015.) In order to engage in calculated use of force, staff must contact the Administrative Officer of the Day (AOD). The AOD is versed in policy and specially trained in the various techniques correctional staff use to maintain order in the prison. When staff have a situation that appears to warrant a calculated use of force, it may be one to two hours before they even contact the AOD to seek approval to engage in a calculated use of force. This can create a long cooling off period that can, at times, make a calculated use of force unnecessary. (Doc. 95-1, Lawton Decl. ¶ 10; Doc. 95-7, Defs.' Ex. A 011-012, 014-015.) Defendant Capt. Botello was the AOD on April 17, 2002. A significant period of time elapsed before correctional staff contacted her, and even more time elapsed before she actually arrived at the institution. (Doc 95-1, Lawton Decl. ¶ 11; Doc. 95-6, Diaz Decl. ¶¶ 4, 12.)  During the period of time staff was contacting defendant Botello and while they waited for her to arrive at the institution, Plaintiff was given every opportunity to turn around, cuff up, and leave his cell peacefully. (Doc. 95-1, Lawton Decl. ¶ 12; Doc. 95-6, Diaz Decl. ¶¶ 4-12.)  Instead of cooperating and cuffing up, Plaintiff used items from his cell to minimize the impact of any chemicals staff might use. He wrapped his head and face, had one or two jump suits on, put his shoes on and laced them over his jumpsuit. This kind of material can create a barrier to the effects of pepper spray. (Doc. 95-1, Lawton Decl. ¶ 13; Doc. 95-7, Defs.' Ex. A 012.) At approximately 11:15 p.m., the cell extraction team introduced themselves on video. The extraction team consisted of: Officer Love, who would use the shield; Officer Hayward, who would be responsible for handcuffs; Officer Robbins, who would be responsible for leg restraints; Officer Gonzales, who would be responsible for the triangle lanyard, and defendant Beebe, who would operate the video camera. Defendant Lawton was the team leader. Defendant Botello, who was there to give administrative approval for the use of force, was also present and introduced herself on video,

as did defendant Diaz. (Doc 95-1, Lawton Decl. ¶ 14; Doc. 95-6, Diaz Decl. ¶ 12; Doc. 95-7, Defs.' Ex. A 012, 015.)   When Plaintiff saw staff members preparing for a tactical cell extraction, he removed some of the window coverings. However, he refused to cuff up and exit his cell. (Doc. 95-6, Diaz Decl. ¶ 11.)   Defendant Lawton gave the inmates in the cells next to Plaintiff's cell an opportunity to leave their cells, but they declined. (Doc 95-1, Lawton Decl. ¶ 15; Doc. 95-7, Defs.' Ex. A 015.)   Defendants Diaz and Lawton entered B Section and went to the door of Plaintiff's cell. Defendant Diaz read the Cell Area Extraction Admonishment to Plaintiff. The Admonishment describes to the inmate what will happen during the cell extraction process. It also gives the inmate another opportunity to comply with orders by cuffing up. (Doc 95-1, Lawton Decl. ¶ 16; Doc. 95-6, Diaz Decl.¶ 14; Doc. 95-7, Defs.' Ex. A 012, 015.)   While defendant Diaz was reading the Admonishment, defendant Lawton saw several milk containers in the cell near the toilet with a yellow liquid in them. Plaintiff's toilet also appeared to contain urine and feces. (Doc 95-1, Lawton Decl. ¶ 17; D Doc. 95-7, Defs.' Ex. A 015.)   Plaintiff refused to comply with the Admonishment. Instead, he used his mattress and other items to barricade the food ports. (Doc 95-1, Lawton Decl. ¶ 18; Doc. 95-6, Diaz Decl. ¶¶ 14-15; Doc. 95-7, Defs.' Ex. A 012, 015; Compl. 5:7-9.)   Defendant Diaz used a barricade removal device to spray pepper spray into Plaintiff's cell. This is a device that is used to push through barriers that an inmate has put up so that pepper spray can actually be sprayed into the area where the inmate is located. (Doc 95-1, Lawton Decl. ¶ 19; Doc. 95-6, Diaz Decl. ¶ 16; Doc. 95-7, Defs.' Ex. A 012, 015.) Defendant Lawton opened the second food port and administered pepper spray from an MK-46 cannister in bursts of about ten to fifteen seconds into the cell. (Doc 95-1, Lawton Decl. ¶ 20; Doc. 95-6, Diaz Decl. ¶ 17; Doc. 95-7, Defs.' Ex. A 012, 015.) The pepper spray appeared to have little effect because of obstructions such as towels and linens Plaintiff had lodged in the food port, as well as the mattress Plaintiff had put up.  (Doc 95-1, Lawton Decl. ¶ 21; Doc. 95-6, Diaz Decl. ¶¶ 17-18; Doc. 95-7, Defs.' Ex. A 012, 015.)   Defendant Lawton continued to give orders to Plaintiff to comply by cuffing up. (Doc 95-1, Lawton Decl. ¶ 22.)  Sgt. Lawton removed the towels and linens from the food port and administered a second MK-46 cannister of pepper spray into the cell in ten to fifteen second bursts. The pepper spray appeared to strike Plaintiff around his waist because of his proximity to the cell door. It did not seem to affect

Plaintiff. He continued to refuse to comply with orders. (Doc. 95-1, Lawton Decl. ¶ 23; Doc. 95-6, Diaz Decl. ¶ 20; Doc. 95-7, Defs.' Ex. A 012, 015.)   Defendant Lawton used another MK-46 cannister in ten to fifteen second bursts, trying to hit Plaintiff in his upper torso. (Doc 95-1, Lawton Decl. ¶ 24; Doc. 95-7, Defs.' Ex. A 012, 015.) The pepper spray began to appear to have an effect. Plaintiff began to comply with defendant Lawton's orders by removing his clothing to facilitate an unclothed body search. However, when defendant Lawton ordered Plaintiff to remove all the items he had placed near the base of his cell door, he refused, using expletives. (Doc 95-1, Lawton Decl. ¶ 25; Doc. 95-6, Diaz Decl. ¶¶ 19-21; Doc. 95-7, Defs.' Ex. A 013, 015.) Defendant Lawton administered a burst of pepper spray from an MK-9 cannister, which is smaller than the MK-46, to Plaintiff's facial area. He continued to order Plaintiff to move all items on the floor to the back of his cell. Plaintiff stood toward the back of his cell and did not comply with defendant Lawton's orders. Defendant Lawton administered a second burst of pepper spray to Plaintiff's facial area. It was important for Plaintiff to move the items to the back of his cell so it would be more difficult to assault staff when they opened the cell door, and so that the items did not present obstacles if the extraction team had to enter the cell to remove Plaintiff. (Doc. 95-1, Lawton Decl. ¶ 26; Doc. 95-6, Diaz Decl. ¶ 22; Doc. 95-7, Defs.' Ex. A 13, 15.) Defendant Diaz instructed Plaintiff to flush his toilet. Plaintiff complied. (Doc 95-1, Lawton Decl. ¶ 27; Doc. 95-6, Diaz Decl. ¶ 23; Doc. 95-7, Defs.' Ex. A 13, 15.) Defendant Lawton instructed Plaintiff several more times to pick up all the items near the cell door, which included the mattress, linens, lunch bags, and the milk cartons, and throw them to the back of the cell. Plaintiff refused to comply. (Doc 95-1, Lawton Decl. ¶ 28; Doc. 95-6, Diaz Decl. ¶ 24; Doc. 95-7, Defs.' Ex. A 13, 15.)   Defendant Lawton used an MK-9 cannister to administer pepper spray to Plaintiff's facial area. Plaintiff complied with defendant Lawton's orders then. Defendant Lawton was able to conduct an unclothed body search to ensure he did not have any contraband on him, such as a weapon or other object he could use to assault staff, before he exited the cell. (Doc 95-1, Lawton Decl. ¶ 29; Doc. 95-6, Diaz Decl. ¶ 25; Doc. 95-7, Defs.' Ex. A 13, 15.)  Plaintiff then surrendered. He was placed in handcuffs with the lanyard attached. After he knelt in compliance with Sgt. Lawton's order, the cell door was opened and staff placed leg restraints and a spit mask on him. (Doc 95-1, Lawton Decl. ¶ 30; Doc. 95-6, Diaz Decl. ¶¶ 25-26;

Doc. 95-7, Defs.' Ex. A 13, 15.)  Plaintiff was escorted to the grass area in front of the housing unit for decontamination with cool running water and a medical evaluation by MTA Chacon. The spit mask was removed to facilitate the decontamination. (Doc 95-1, Lawton Decl. ¶ 31; Doc. 95-6, Diaz Decl. ¶ 27; Doc. 95-7, Defs.' Ex. A 13, 15.)  MTA Chacon medically cleared Plaintiff. (Doc 95-1, Lawton Decl. ¶ 32; Doc. 95-6, Diaz Decl. ¶ 29; Doc. 95-7, Defs.' Ex. A 013, 015.)

Defendants argue that the only defendants involved in the cell extraction were Botello, Diaz, Lawton and Beebe, and that they used only the amount of force necessary to bring a disruptive inmate under control.  (Doc. 94-1, Defs' Motion for Summary Judgment, p.13.)  Defendants argue that there is no evidence showing that they acted maliciously and sadistically for the purpose of causing pain to Plaintiff.  Defendants argue that they have a duty to protect prison staff and inmates and maintain safety and security in the institution, and could not simply ignore Plaintiff's refusal to uncover his cell, or his refusal to cuff up and come out of his cell.  (Id.)  Defendants further submit evidence that defendant Tracy was not involved in the cell extraction, and argue that Plaintiff cannot produce evidence indicating otherwise.  (Id.; Doc. 95-5, Tracy Decl. ¶2.)

### iii.    Plaintiff's Position[5]

In opposition, Plaintiff argues that his cell was not covered up and that he never threatened to cover up or to gas staff.  (Doc. 133, Pl's Opp., p.16.)  Plaintiff further argues that the amount of pepper spray used on Plaintiff's naked body was excessive and amounts to sexual assault and torture.[6]

Plaintiff submits his own declarations attesting that on April 17, 2002 at approximately 5:30 p.m., defendant Bailey delivered Plaintiff a pair of "holely" socks.[7]  (Doc. 134-2, Pl's Ex. 2, Glass

---

[5] Plaintiff's materials, with accompanying exhibits, are over 500 pages long.  For ease of reference, the Court identifies Plaintiff's documents using his page numbering.

[6] Plaintiff did not allege a separate state claim for sexual assault in the operative pleading.  There are no state claims proceeding in this action.

[7] In opposition to Defendants' motion, Plaintiff has submitted five of his own declarations.  (See Doc. 134-2, Ex. 2.)  The Court notes that there are inconsistencies amongst the declarations.  In resolving Defendants' motion for summary judgment, the Court analyzes and summarizes these declarations in the light most favorable to Plaintiff. However, as explained in more detail below, the Court will not consider declaration evidence that is clearly inapposite to Plaintiff's verified complaint.

Decl., identified as p.0017 at ¶3.)  Plaintiff requested that the socks be exchanged for another pair or that his original pair be returned to him, but his request was denied.  (Id., ¶4.)  Plaintiff used the socks to prevent defendant Bailey from placing the extended food port back into its slot.  (Id., ¶7.) Defendant Bailey asked Plaintiff if he wanted his legal mail.  Plaintiff said yes. (Id., ¶8.)  Defendant Bailey informed Plaintiff that he was not going to issue it because Plaintiff was holding the food port hostage. (Id., ¶9.)  At approximately 6:45 p.m. defendant Lawton approached him with the same legal mail in his hand that defendant Bailey earlier held.  Defendant Lawton asked Plaintiff if he wanted his legal mail, and began reading the address of the Ninth Circuit Court of Appeal in San Francisco dated 4/15/2002. Plaintiff said yes. (Id., ¶10.) Defendant Lawton indicated that he would order morning staff not to feed Plaintiff until the food port was secure.  (Id., ¶11.) Plaintiff agreed to allow defendants Bailey and Lawton to place the extended food port in its slot and place a pad lock on the outside of the food port.  (Id., ¶12.)  However, defendant Lawton indicated that Plaintiff would not be issued his legal mail from the Ninth Circuit Court of Appeals because Plaintiff had held his food port and made defendant Lawton come over.  (Id., ¶13.)  Plaintiff then informed defendant Lawton that he had already filed a grievance against him and defendant Tracy for unlawfully confiscating his legal materials and denying him access to the courts, and that Plaintiff would be able to prove a "pattern" against him.  (Id., ¶18.)  Defendant Lawton then looked into his cell and said that he was "covered up" and that he was going to take Plaintiff's legal materials to stop Plaintiff from litigating and accessing the courts, even if he had to lie to defendant Tracy, his superior.  (Id., ¶19; Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0035 at ¶11.)  Defendant Lawton said he would lie to defendant Tracy, saying that his cell was covered up and have Plaintiff cell extracted and placed on strip cell status.  (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0035 at ¶11.)  Defendant Tracy came over to view Plaintiff's cell, determined that Plaintiff's cell was not covered up, and gave defendant Lawton a direct order not to assemble a cell extraction team. (Id., ¶¶12, 13.)  At approximately 9:50, M.T.A. Muro approached Plaintiff's cell and talked to him face to face because Plaintiff's cell door and windows were not covered up. (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0029 at ¶19.)  At approximately 11:40, defendant Lawton entered 4A2R-B Section and asked inmates  in cells 4A2R-25 and 4A2R-27 if they wanted to come out of

their cells. (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0029 at ¶24.)   Plaintiff was never asked by defendants Diaz nor Lawton whether he wanted to come out of his cell. (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0030 at ¶25.)   At approximately 11:24 p.m. defendant Botello entered the rotunda area.   Defendant Botello authorized defendants Diaz, Beebe and Lawton to cell extract Plaintiff. (Id., ¶26.)   CDCR cell extraction policy mandates that a medical doctor authorizing the use of O.C. pepper spray on a prisoner must do so in writing, and not verbally. (Id., ¶29.)   At approximately 12:00 a.m. defendants Diaz, Lawton, Beebe and Botello arrived at Plaintiff's cell. (Id., ¶30.)   Defendant Diaz informed Plaintiff that he wanted his property and that he was placing Plaintiff on strip cell status because his cell was covered up. (Id., ¶31.)   Plaintiff informed defendant Diaz that his cell was never covered up. (Id., ¶31.)   Plaintiff grabbed his mattress to protect himself. (Id., ¶33.)   Defendants Diaz and Lawton placed a fire extinguisher sized canister of pepper spray through the special food port and emptied its contents into his cell. (Id., ¶34.)   Plaintiff immediately dropped his mattress and placed both arms through the regular food port to submit to cuffs and to voluntarily exit the cell. (Id., ¶35.)   Defendants Lawton and Diaz pushed Plaintiff's arm back though the food port and slammed it shut. (Id., ¶37.)   Defendants stated that before he was to exit his cell, Plaintiff was to remove all his clothes. (Id., ¶38.)   As Plaintiff began to disrobe, defendant Lawton opened the food port and sprayed Plaintiff over his entire body without provocation. (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0031 at ¶39.)   After Plaintiff was totally nude he was forced to pick up papers and other articles off the floor.   Each time he bent over or stood up, defendants Diaz and Lawton would use pepper spray on his buttocks and testicles. (Id., ¶44.)   Defendants Diaz and Lawton had Plaintiff running around for sport, and soaked his entire body with pepper spray. (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0020 at ¶46.)   After approximately five minutes, Plaintiff was allowed to put on a pair of boxer shorts, submit to hand cuffs, and exit the cell. (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0031 at ¶45.)   Plaintiff argues that defendant Beebe was present, videotaped the incident, and failed to intervene.   Plaintiff likewise argues that defendant Botello also failed to stop the use of force or intervene on Plaintiff's behalf.

     **iv.   Discussion**

     "What is necessary to show sufficient harm for purposes of the Cruel and Unusual

Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." Hudson v. McMillian, 503 U.S. 1, 8 (1992). "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." Id. (internal quotation marks and citations omitted). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. Id. at 9; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries)). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. (internal quotation marks and citations omitted). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." Id.

### a.    Whether the Force Used was Excessive

The parties agree on very little regarding the circumstances and events leading up to the calculated cell extraction on April 17, 2002. Defendants contend that Plaintiff covered his cell window and door; Plaintiff disagrees. However, it is undisputed that when Plaintiff was ordered to cuff up, he instead placed a mattress in front of his body "to protect himself from the malfeasance and egregious misconduct of [the] prison officials". (Doc. 134-2, Pl's Ex. 1, Comp., ¶¶ 25, 26.) It is also undisputed that prior to the administration of pepper spray, defendant Lt. Diaz read the Cell

Area Extraction Admonishment to Plaintiff.  The Admonishment describes what will happen during the cell extraction process.  It also gives the inmate another opportunity to comply with orders by cuffing up.[8]

Insubordination is a matter taken very seriously within the confines of an institutional setting. Defendants contend that the cell extraction was necessitated by Plaintiff's covering of his cell window and door, which Plaintiff denies doing. However, Plaintiff certainly created a need for the application of force and the consequent cell extraction when he refused to comply with staff orders, and instead used his mattress to form a barricade.  (See Doc. 153, Videotape, at 10:15:59.) Defendants could reasonably have perceived Plaintiff's disobedience to be a threat requiring the use of force. The Court therefore finds that the initial application of pepper spray was used to enforce compliance with an order to cuff up and in response to Plaintiff's use of his mattress as a barricade, and not as punishment.  The legitimate intended result was compliance, not the infliction of pain, and the initial use of pepper spray was reasonable under the circumstances. Viewing the evidence in the light most favorable to Plaintiff, defendants Lawton and Diaz's use of pepper spray in an effort to make Plaintiff compliant with orders to cuff up simply do not support a claim for relief under section 1983 for use of excessive physical force.  With respect to the initial application of pepper spray, the Court finds that the force applied by defendants was "a good-faith effort to maintain or restore discipline," and was not applied "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.

However, there are factual disputes between the parties that are material and preclude summary judgment on Plaintiff's excessive force claim against defendants Diaz, Lawton, Beebe and Botello. Plaintiff submits evidence that after the initial application of pepper spray, he immediately dropped his mattress and placed both arms through the regular food port to submit to cuffs and to voluntarily exit the cell.  At some point during the cell extraction Plaintiff was ordered to remove his clothes and he eventually complied. Plaintiff contends that each time he bent over or stood up to pick up papers and other articles off the floor as ordered, defendant Lawton would use pepper

---

[8] Plaintiff states that this fact is in dispute but the evidence he cites to does not discuss or describe the Admonishment.

spray on his buttocks and genitals. Plaintiff also argues that defendants Diaz and Lawton had Plaintiff run around for sport, and soaked his entire body with pepper spray. After approximately two or five minutes, Plaintiff was allowed to put on a pair of boxer shorts and submit to hand cuffs and to exit the cell. Plaintiff submits that defendants used an excessive amount of pepper spray, and used the spray inappropriately, aiming at his genitals.

In reply, Defendants argue that Plaintiff's assertions that he was forced to take off his clothes and run around the cell while pepper spray was used on him is absurd, because Plaintiff has given no indication of the "force" used by defendants, defendants were on the other side of a locked prison cell door, and Plaintiff could not be forced to do anything given his refusal to comply with other orders. Nonetheless, in light of Plaintiff's evidence that he was willing to comply with orders, that defendants Lawton and Diaz used the pepper spray aimed at his genitals, and that defendants Botello and Beebe observed but failed to intercede, there are factual issues in dispute as to whether there was a need for the application of force, the relationship between the need and amount of force used, the threat reasonably perceived by defendants, and efforts made to temper the response by defendants. Hudson, 503 U.S. at 7.

> **b.    Whether Plaintiff Sustained an Objectively Serious Deprivation or Injury**

Defendants further argue that they are entitled to summary judgment on the excessive force claim because Plaintiff cannot show that he sustained an objectively serious deprivation or injury. (Doc. 94-1, Defs' Motion for Summary Judgment, p.14). The use of excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. Hudson, 503 U.S. at 4. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." Id. at 9. (internal citations omitted).

Plaintiff has raised a material question of fact as to whether the continued use of pepper spray during the cell extraction was malicious and sadistic, or whether it was applied in a good faith effort to maintain or restore discipline. Defendants' assertion that Plaintiff suffered no serious injury does not entitle them to summary judgment.

1

### c. Qualified Immunity

2   Next, defendants Botello, Diaz, Lawton and Beebe argue that they are entitled to qualified

3   immunity.  Government officials enjoy qualified immunity from civil damages unless their conduct

4   violates "clearly established statutory or constitutional rights of which a reasonable person would

5   have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  Thus, if a

6   constitutional violation occurred, prison officials are entitled to qualified immunity if they acted

7   reasonably under the circumstances. Millender v. County of Los Angeles, 564 F.3d 1143, 1148 (9th

8   Cir. 2009).  "Qualified immunity balances two important interests - the need to hold public officials

9   accountable when they exercise power irresponsibly and the need to shield officials from harassment,

10   distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 129 S.Ct.

11   808, 815 (2009), and protects "all but the plainly incompetent or those who knowingly violate the

12   law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

13   In resolving a claim of qualified immunity, courts must determine whether, taken in the light

14   most favorable to the Plaintiff, the defendant's conduct violated a constitutional right, and if so,

15   whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156

16   (2001); McSherry v. City of Long Beach, 560 F.3d 1125, 1129-30 (9th Cir. 2009).  While often

17   beneficial to address in that order, courts have discretion to address the two-step inquiry in the order

18   they deem most suitable under the circumstances. Pearson, 129 S.Ct. at 818 (overruling holding in

19   Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only

20   if the court first finds a constitutional violation); McSherry, 560 F.3d at 1130.

21   As explained above, there is a material question for the trier of fact as to whether defendants

22   Botello, Diaz, Lawton and Beebe violated Plaintiff's constitutional rights.  Under the second prong

23   of the inquiry, Defendants assert that reasonable officers in their positions could reasonably have

24   believed that the conduct was lawful, and argue that many efforts were made to temper the use of

25   pepper spray.  Defendants further argue that it was reasonable to conclude that Plaintiff would not

26   leave his cell peacefully, and that they had an authority and duty to use force to bring Plaintiff under

27   control.

28   By 2002, the law was sufficiently clear that the malicious and sadistic use of force to cause

15

harm always violates the Eighth Amendment, regardless of whether or not significant injury is evident. Hudson. at 9-10.  A reasonable officer would not believe that the continued use of pepper spray aimed at an inmate's genitals after the inmate is willing to comply with orders is reasonable. With respect to defendants Botello and Beebe, an officer can be held liable for failing to intercede only if he had a "realistic  opportunity" to intercede.  Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000); Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).  No reasonable officer would believe that watching and refusing to intervene when an inmate is pepper-sprayed while complying with staff orders is lawful.  Defendants Botello, Diaz, Lawton and Beebe are not entitled to qualified immunity.

### d.   Defendant Tracy

Defendants submit evidence that defendant Tracy is entitled to summary judgment because he was not involved in the calculated cell extraction.  Defendants submit defendant Tracy's declaration, as well as crime incident reports suggesting that defendant Tracy was not an involved party in the incident.  (Doc. 95-5, Tracy Decl., ¶2.)

In opposition, Plaintiff argues that defendants fail to meet their initial burden.  Plaintiff argues that the prison records upon which defendants rely, namely  Rules Violation Reports "and other irrelevant documents," are self-serving and lack reliability and trustworthiness. (Doc. 133, Pl's Opp., pp.17:28-18:1.)

Notwithstanding Plaintiff's assertion that prison records cannot sustain Defendants' motion for summary judgment, Defendants have submitted the declaration of defendant Tracy attesting that he was not involved in the cell extraction on April 17, 2002.  Defendants have also submitted a videotape of the incident, and defendant Tracy is not identified as a member of the cell extraction team. Plaintiff must do more than attack the credibility of defendants' evidence.  See National Union Fire. Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert . . . judgment.").  Plaintiff has submitted no evidence in opposition contradicting defendant Tracy's sworn declaration, or even suggesting that defendant Tracy was involved.

In the alternative, Plaintiff argues that if defendant Tracy was not involved, the court should

1  conclude that defendant Lawton conspired with defendant Diaz to wait until defendant Tracy was

2  off duty to conduct the cell extraction, and that defendants Diaz, Lawton, Beebe and Botello all acted

3  unlawfully.   Under this theory, defendant Tracy is liable because he refused to reprimand or

4  discipline defendant Lawton for his insubordination when he learned of the cell extraction the

5  following day.  (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0036.)

6       First, Plaintiff may not expand the scope of this litigation via deposition testimony or his

7  opposition to defendants' motion for summary judgment.  See Gilmore v. Gates, McDonald & Co.,

8  382 F.3d 1312, 1315 (11th Cir. 2004).  The basis for his Eighth Amendment claim against defendant

9  Tracy as pled in his verified complaint was not a failure-to-discipline issue and Plaintiff cannot now

10  assert such an argument in the alternative when opposing summary judgment. Second, Plaintiff

11  cannot create a triable issue of fact in order to defeat summary judgment by submitting a

12  contradictory declaration, as he attempts to do here. Finally, Plaintiff's assertion that he was

13  informed by M.T.A. Muro that defendants Diaz and Lawton were conspiring without defendant

14  Tracy's knowledge is based not on personal knowledge, but inadmissible hearsay, which is not

15  competent material for a Rule 56 declaration.  Scosche Industries, Inc. v. Visor Gear Inc., 121 F3d

16  675, 681 (C.A. Fed (Cal.) 1997).  ("hearsay evidence in Rule 56 affidavits is entitled to no weight"

17  (internal quotations omitted))

18       There exists no genuine issue of material fact as to defendant Tracy's lack of involvement,

19  and he is therefore entitled to summary judgment on the excessive force claim against him.

20       **B.     May 5, 2002 Incident**

21            **i.     Summary of Plaintiff's Complaint**

22       Plaintiff alleges that on May 5, 2002 while preparing to be discharged from the Acute Care

23  Hospital ("ACH") and upon learning that defendant Bailey would be escorting Plaintiff, he informed

24  defendant Kraay and Officer King that he feared for his safety. (Doc. 134-2, Pl's Ex. 1, Comp., ¶37.)

25  Defendant Kraay and Officer King responded by saying that they were not hired as correctional

26  officers to protect Plaintiff.  (Id., ¶38.)  Defendants Bailey and Case arrived and placed Plaintiff in

27  handcuffs and leg irons.  (Id., ¶39.) Plaintiff complained that the leg restraints were impeding his

28  ability to walk and asked defendant Bailey if they could be loosened.  (Id., ¶40.) Defendants Bailey

and Case began "manhandling" and physically forcing Plaintiff to walk.  (Id., ¶41.) When Plaintiff complained again defendants Bailey and Case slammed him to the ground face first, and started stomping and kicking Plaintiff in his head, back and stomach while making racial slurs. (Id., ¶¶41, 42.)  Defendant Sgt. Kraay and Officer King then arrived but refused to order defendant Bailey to get off or stop attacking Plaintiff. (Id., ¶44.) Defendant Bryant then arrived on scene and without provocation started bending Plaintiff's shackled legs towards his buttocks, and grabbed and squeezed Plaintiff's testicles. (Id., ¶¶45, 46.)  Approximately ninety seconds later, defendant Lawton stood over Plaintiff and stated that he could now extend Plaintiff's strip cell status and withhold Plaintiff's legal mail and property, to prevent Plaintiff from litigating.  (Id., ¶48.)

### ii.    Defendants' Position

Defendants argue that defendants Lawton, Bailey, Case and Bryant did not use excessive force on Plaintiff when he was under escort, that Plaintiff cannot show that he sustained an objectively serious deprivation or injury, and that they are each entitled to qualified immunity.

On April 18, 2002, at approximately 11:50 a.m., Plaintiff was admitted to a Mental Health Crisis bed in the ACH. (Undisputed Fact ("UF") 1.) When an inmate is discharged from the ACH, he is never told who will be escorting him from the ACH to another location in the prison. Information about who will be conducting the escort is not known by staff in the ACH until the officer or officers actually show up at the ACH to conduct the escort. The inmate does not learn who will be escorting him until the officer shows up at the inmate's hospital cell door. (Doc. 95-4, Kraay Decl. ¶3.)  On May 5, 2002, at approximately 7:15 p.m., Defendants Officers Bailey and Case reported to the ACH Mental Health Crisis Unit to escort Plaintiff, who was being discharged, back to his cell in the SHU.  (UF 2.)  After Defendants Bailey and Case placed handcuffs on Plaintiff through the food port in his hospital cell door, they escorted Plaintiff to the area near the officers' station in the ACH Mental Health Crisis Unit. Defendant Officer Bailey instructed Plaintiff to kneel on a chair that was placed against the wall so he could apply leg restraints to Plaintiff. (UF 3.) Plaintiff refused to kneel on the chair.  Instead, Plaintiff asked where the chrono was that said he had to be placed in leg restraints.  (Doc. 95-3, Bailey Decl. ¶5.)  Procedures required that inmates being escorted to or from the ACH Mental Crisis Unit be placed in leg restraints. Moreover, correctional

staff have the authority to place any inmate they are escorting that they believe is in a disruptive or agitated state in leg restraints before escorting him. (Id., ¶ 4.)  Defendant Officer Bailey explained that there was no need for a chrono, because procedure required that he be placed in leg restraints. (Id., ¶ 6; Doc. 95-8, Defs.' Ex. B 9-10, 13.)  Plaintiff then stiffened his upper body and became resistive. (Doc. 95-3, Bailey Decl. ¶7; Doc. 95-8, Defs.' Ex. B 10, 13.)  Plaintiff turned toward defendant Bailey, becoming increasingly agitated and getting louder. He yelled that they needed a chrono to apply the leg restraints. (Doc. 95-3, Bailey Decl. ¶ 7; Doc. 95-8, Defs.' Ex. B 10, 13.) Defendant Bailey told Plaintiff to turn away from him and calm down, but he continued turning to face Defendant Bailey. (Doc. 95-3, Bailey Decl. ¶ 8; Doc. 95-8, Defs.' Ex. B 10, 13.)  Defendant Bailey was afraid that Plaintiff, who had a history of staff assaults, would try to head butt him. Defendant Bailey believed he had to eliminate that possibility by placing Plaintiff in a prone position on the floor. (Doc. 95-3, Bailey Decl. ¶ 9; Doc. 95-8, Defs.' Ex. B 10.)  With his left and right hands on Plaintiff's upper left arm, Defendant Bailey pulled down, pulling Plaintiff toward him while twisting his own body to the left. Defendants Bailey and Case placed Plaintiff in a prone position on the floor and held him there until responding staff arrived. (Doc. 95-3, Bailey Decl. ¶ 10; Doc. 95-8, Defs.' Ex. B 10, 13.)  Officer King, who was assigned to the Mental Health Crisis Unit, saw defendants Bailey and Case taking Plaintiff to the floor as he was putting mail in the unit mail box. He hit his personal alarm. (Doc. 95-8, Defs.' Ex. B 16; Doc. 95-4, Kraay Decl. ¶ 5.)  When defendant Kraay arrived on the scene, he saw defendants Bailey and Case on the ground with Plaintiff, in front of the officers' station in the Mental Health Crisis Unit. He instructed defendant Officer Bryant, who also responded to the alarm, to obtain a triangle lanyard and attach it to the handcuffs on Plaintiff' wrists. The triangle lanyard gives correctional officers better control over a resistive inmate. (Doc. 95-4, Kraay Decl. ¶ 6.)  The triangle lanyard was located in the Control Booth, which was some distance away. It took a while for defendant Bryant to retrieve the lanyard from the Control Booth. (Doc. 95-4, Kraay Decl. ¶ 7.)  Defendant Case placed the leg restraints on Plaintiff. (Doc. 95-8, Defs.' Ex. B 13.)  After defendant Bryant returned with the lanyard and attached it to Plaintiff's handcuffs, defendant Kraay instructed Officer King and defendant Bryant to assist Plaintiff to his feet, move him to the nearest wall, and position him so he was facing the wall. Defendant Kraay did

1   not see defendant Bryant in physical contact with Plaintiff at any time before he assisted Plaintiff to

2   his feet. Defendant Kraay instructed Officer King and defendant Bryant to assist Plaintiff to his feet

3   so he could receive a medical evaluation. (Doc. 95-4, Kraay Decl. ¶ 8; Doc. 95-3, Bailey Decl. ¶ 11;

4   Doc. 95-8, Defs.' Ex. B 17.)   Defendant Kraay summoned Psychiatric Technician R. Davis to

5   perform a medical evaluation of Plaintiff. (UF 4.)  Although Plaintiff complained about pain to the

6   left side of his face, both shoulders, his right ribs, both wrists, and his testicles, MTA Davis noted

7   that Plaintiff had no visual injuries. (UF 5.)  After Psych Tech Davis cleared Plaintiff medically,

8   defendant Kraay instructed Officer Park and defendant Bryant to escort Plaintiff to a holding cell in

9   the Emergency Room area until an escort team from Facility 4A arrived to escort Plaintiff back to

10  the SHU. Plaintiff was not placed in the holding cell so he could be seen by defendant Dr. Dang,

11  because Psych Tech Davis had already conducted a medical evaluation and had medically cleared

12  Plaintiff. (Doc. 95-4, Kraay Decl. ¶ 10; Doc. 95-8, Defs.' Ex. B 17.)   Defendant Kraay called

13  Facility 4A to inform them about the incident with Plaintiff. He requested a second escort team.

14  (Doc. 95-4, Kraay Decl. ¶ 12.) Defendant Lawton received a phone call informing him that Plaintiff

15  had resisted staff while under escort from the ACH back to the SHU. He went to the ACH with

16  Officers Lawson and Dominguez to supervise Plaintiff's escort back to the SHU. (Doc. 95-1, Lawton

17  Decl. ¶¶ 36-37.)  Defendant  Lawton arrived at the ACH with Officers Dominguez and Lawson to

18  escort Plaintiff back to Facility 4A approximately ten to fifteen minutes after defendant Kraay called

19  Facility 4A to report the incident and ask for a new escort team. (Doc. 95-4, Kraay Decl. ¶ 13.)

20  Defendant Lawton instructed Officers Lawson and Dominguez to place Plaintiff in a wheelchair to

21  provide a more controlled escort back to the SHU. (Doc. 95-1, Lawton Decl. ¶ 39; Doc. 95-8, Doc.

22  95-8, Defs.' Ex. B 14, 18, 19.) After speaking with defendant Dr. Dang in the ACH about providing

23  medical attention and documentation to defendant Bailey, defendant Lawton left the ACH and

24  supervised the escort of Plaintiff back to his cell in the SHU without further incident.  (Doc. 95-1,

25  Lawton Decl. ¶ 40; Doc. 95-8, Defs.' Ex. B 19.)

26      **iii.    Plaintiff's Position**

27          Plaintiff submits evidence that after he submitted to handcuffs, defendants Bailey and Case

28  escorted him to the officer's station where the placed him in legirons. (Doc. 134-2, Pl's Ex. 2, Glass

Decl., identified as p.0022 at ¶68.)  Plaintiff informed defendants Bailey and Case that the legirons were too tight and asked that they be loosened. (Id., ¶69.)  Without provocation defendant Bailey body slammed Plaintiff face first to the ground and pounced on him, punching him in the face, head and ribs. (Id., ¶70.)  Defendant Case also began striking Plaintiff in the back, face and ribs.  (Id., ¶71.)  Defendant Bryant put his knees on Plaintiff's back and ribs and caused Plaintiff's ribs to "pop". (Id., ¶72.)  Defendant Lawton was present and ignored Plaintiff's request for medical help.  (Id., ¶¶73, 74.)  Defendant Kraay was present and witnessed defendants Bailey, Case and Bryant attack and punch Plaintiff while Plaintiff was totally subdued, but did nothing to stop the attack or assist Plaintiff.  Defendant Kraay informed Plaintiff that he was not there to assist Plaintiff. (Id., ¶75.)

**iv.  Discussion**

**a.  Whether the Use of Force was Excessive**

In reply, Defendants argue that Plaintiff tells a different story in his opposition than what was alleged in his verified complaint.[9]  While there are apparent inconsistencies between Plaintiff's argument in opposition when compared to his verified complaint and his declarations summarized above, arguments or contentions set forth in a responding brief do not constitute evidence, and the Court relies on Plaintiff's evidence when determining whether defendants are entitled to summary judgment.  The evidence relied upon here, namely Plaintiff's declarations, are sufficient to create a

---

[9]  In his unverified opposition, Plaintiff argues that the May 5, 2002 incident occurred when he realized that defendant Bailey was one of the escorting officers.  Plaintiff then informed an inmate Bradford that defendant Bailey was a foul correctional officer, who was involved in withholding Plaintiff's legal mail, and in torturing Plaintiff on April 17, 2002.  Inmate Bradford stated that he would be a witness if an attack were to occur while Plaintiff was handcuffed and defenseless.  Plaintiff argues that defendant Bailey heard the conversation and became hostile and belligerent.  Plaintiff refused to submit to handcuffs until defendant Bailey appeared to have calmed down.  Once Plaintiff submitted to handcuffs, defendant Bailey became physically aggressive and began manhandling Plaintiff with the assistance of defendant Case.  Defendant Bailey then applied leg restraints on Plaintiff.  Plaintiff complained that the leg restraints were too tight, and without provocation, defendants Bailey and Case viciously and violently body slammed him face first to the ground and began immediately kicking, punching, and stomping on Plaintiff on the body, face and head.  Plaintiff argues that defendant Bryant then arrived and kicked and kneed Plaintiff, and bent his legs and knees backwards.  Plaintiff then alleges that defendant Kraay arrived on scene while defendants Bryant, Bailey and Case were still punching, kicking, stomping and attacking Plaintiff.  Plaintiff contends that when he asked for help, defendant Kraay informed Plaintiff that it was not his duty to help or prevent Plaintiff or inmates from other prison guard attacks. Plaintiff argues that defendant Lawton then arrived.  Plaintiff argues that defendant Lawton participated by planning and orchestrating the attack and assault in retaliation for Plaintiff's grievance activities. (Doc. 133.)

triable issue of fact as to whether the use of force by defendants Bailey, Case and Bryant was malicious and sadistic or whether they applied a reasonable amount of force necessary to subdue and keep control an inmate.

With respect to defendant Lawton, there are no material facts at issue as to whether defendant Lawton used excessive force against Plaintiff.  Plaintiff's attests that he noticed at some point that defendant Lawton was present. Plaintiff attests that defendant Lawton ignored Plaintiff's request for medical treatment and stated that he would return Plaintiff to strip cell status.  However, Plaintiff submits no evidence showing that defendant Lawton participated in the use of force or was in a position to intercede.  Plaintiff's evidence shows that defendant Lawton arrived after the use of force occurred.  Therefore, to the extent that Plaintiff has alleged an Eighth Amendment claim arising from the use of excessive force by defendant Lawton, defendant Lawton is entitled to summary judgment.

### b.   Whether Plaintiff Sustained an Objectively Serious Deprivation or Injury

Defendants further argue that they are entitled to summary judgment on the excessive force claim arising May 5, 2002 because Plaintiff cannot show that he sustained an objectively serious deprivation or injury.  (Doc. 94-1, Defs' Motion for Summary Judgment, pp.19-20.)

For the same reasons as discussed above regarding the April 17, 2002 excessive force claim, Defendants' motion on this ground fails.  (See Section II.A.iv.b.) Plaintiff has raised a triable issue of fact as to whether the use of force on May 5, 2002 was malicious and sadistic, or whether it was applied in a good faith effort to maintain or restore discipline.  Defendants' assertion that Plaintiff suffered no serious injury does not entitle them to summary judgment.

### c.   Qualified Immunity

Defendants Lawton, Bailey, Case and Bryant argue that they are entitled to qualified immunity because they did not violate Plaintiff's Eighth Amendment rights, and further that reasonable officers in their position could reasonably have believed that the conduct was lawful.

Because the Court finds that defendant Lawton is entitled to summary judgment on the Eighth Amendment excessive force claim against him, the Court considers this argument for qualified immunity only as to defendants Bailey, Case and Bryant.

1       As explained above, there is a material question for the trier of fact as to whether defendants

2  Bailey, Case and Bryant violated Plaintiff's constitutional rights.  Under the second prong of the

3  inquiry, Defendants assert that reasonable officers in their positions could reasonably have believed

4  that the conduct was lawful.  Defendants Bailey and Case argue that they reasonably believed that

5  Plaintiff was refusing to have leg restraints applied and when defendant Bryant responded, he

6  reasonably believed that it was necessary to attach a lanyard to Plaintiff's handcuffs, as defendant

7  Kraay directed him to do, because it would give correctional staff greater control over a disruptive

8  inmate.

9      Taking the evidence in the light most favorable to Plaintiff, a reasonable officer would not

10  believe that slamming an inmate to the ground and punching him in the face, head and ribs without

11  provocation, or placing ones knees on Plaintiff's back and ribs and causing Plaintiff's ribs to "pop",

12  are reasonable uses of force in the circumstances described by Plaintiff.  Defendants Bailey, Case

13  and Bryant are not entitled to qualified immunity.

14          **d.    Defendant Kraay**

15      Plaintiff has submitted evidence that defendant Kraay was present and witnessed defendants

16  Bailey, Case and Bryant attack and punch Plaintiff while Plaintiff was totally subdued, and did

17  nothing to stop the attack or assist Plaintiff.  ( Doc. 134-2, Pl's Ex. 1, Comp., ¶44; Doc. 134-2, Pl's

18  Ex. 2, Glass Decl., identified as p.0022 at ¶75.[10])

19      An officer can be held liable for failing to intercede only if he had a "realistic  opportunity"

20  to intercede.  Cunningham, 229 F.3d at1289; Robins 60 F.3d at 1442.   Construing the evidence in

21  the light most favorable to Plaintiff, there is a genuine issue of fact as to whether defendant Kraay

22  could reasonably have interceded to protect Plaintiff from the use of force, and whether he acted

23  reasonably under the circumstances.

24

25

26         [10] In his verified complaint, Plaintiff alleges that defendant Kraay observed and failed to stop defendant Bailey from attacking Plaintiff. In his declaration, Plaintiff states that defendant Kraay witnessed defendants Bailey, Case and Bryant attack and punch Plaintiff while he was totally subdued and helpless, and responded to Plaintiff's

27  request for help by stating that it was not there to assist Plaintiff. This discrepancy, along with several others, were noted by Defendants in their reply, but are not sufficient to warrant a grant of summary judgment on the Eighth

28  Amendment claim against defendant Kraay. Of course, Defendants may use any such inconsistencies to impeach Plaintiff at trial.

1   Defendants further argue that Kraay is entitled to qualified immunity.  Where there are

2   factual disputes as to the parties' conduct or motives, the case cannot be resolved at summary

3   judgment on qualified immunity grounds. See Liston v. County of Riverside, 120 F.3d 965, 967 (9th

4   Cir. 1997); Collins v. Jordan, 110 F.3d 1363, 1369 (9th Cir. 1997); Alexander v. City of San

5   Francisco, 29 F.3d 1355, 1364 (9th Cir. 1994); ACT UP!/Portland v. Bagley, 988 F.2d 868, 873 (9th

6   Cir. 1993).

7   As detailed above, there are significant differences between Plaintiff's and Defendants'

8   version of events concerning the May 5, 2002 use of force and the extent and nature of defendant

9   Kraay's involvement.  These differences preclude a grant of summary judgment on qualified

10  immunity grounds. Defendant Kraay is not entitled to summary judgment.

11  **C.      Denial of Medical Care - Defendant Dr. Dang**

12  "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

13  must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096

14  (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).  The two part

15  test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by

16  demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or

17  the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was

18  deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059

19  (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th

20  Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by "a

21  purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused

22  by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference may be

23  manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or

24  it may be shown by the way in which prison physicians provide medical care." Id. (citing McGuckin

25  at 1060 (internal quotations omitted)).  Where a prisoner is alleging a delay in receiving medical

26  treatment, the delay must have led to further harm in order for the prisoner to make a claim of

27  deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd.

28  of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

24

1    In his complaint, Plaintiff alleges that defendant Dr. Dang denied Plaintiff medical attention

2   and/or treatment following the April 17, 2002 and May 5, 2002 incidents in retaliation for Plaintiff's

3   grievance activity.[11]  (Doc. 134-2, Pl's Ex. 1, Comp., identified as pp.0013 - 0014.)

4              **i.    Medical Care Following the April 17, 2002 Incident**

5    Following the cell extraction on April 17, 2002, M.T.A. Chacon medically cleared Plaintiff.

6   (UF 6.)  Plaintiff indicated that he was suicidal. (UF 7.[12])  Officers Love, Hayward and Gonzales

7   escorted Plaintiff to the Acute Care Hospital (ACH).  (UF 8.)  Defendants contend that Plaintiff was

8   brought to ACH because he said he was suicidal.  (Doc. 95-1, Lawton Decl., ¶33.)  Plaintiff argues

9   that he was brought to ACH because of his injuries.  (Doc. 134-2, Ex. 2, Glass Decl., identified as

10   p.0031 at ¶52.) Defendants contend Plaintiff was examined and evaluated by Dr. Raman and

11   discharged.  At approximately 12:50 a.m. Plaintiff was escorted from the ACH back to his cell.  (UF

12   9.[13])  At approximately 3:00 a.m., Plaintiff complained that he was burning up.  M.T.A. Chacon

13   evaluated Plaintiff, and recommended that Plaintiff use the cool running water in his cell. (UF 10.)

14   On April 18, 2002 at approximately 11:50 a.m., Plaintiff was admitted to a Mental Health Crisis bed

15   in the ACH.  (UF 1.)

16    Defendants contend that Plaintiff's patient record for April 18, 2002 to May 5, 2002 shows

17   that defendant Dr. Dang did not treat Plaintiff.  (Doc. 95-10, Defs' Ex. F.)  Defendants contend that

18   the only record of defendant Dr. Dang's involvement was a summary he prepared on August 21,

19   2002 of Plaintiff's stay in the Mental Health Crisis Unit, after reviewing Plaintiff's chart. Defendants

20   contend that Plaintiff was under the care of psychiatrist Dr. Davis from April18, 2002 through May

21   5, 2002. Defendants argue that Plaintiff cannot submit any evidence showing that defendant Dr.

22   Dang was on the scene or involved in any way on April 17, 2002 and that therefore defendant Dr.

23   Dang is entitled to summary judgment.

24

25        [11] Plaintiff's retaliation claims are discussed separately below.  See Section II.E.

26        [12] Plaintiff denies ever stating he was suicidal.  (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p.0031.)
Plaintiff's declaration testimony is directly contradicted by his own statement on videotape.  (Doc. 152, Videotape,
27   at 10:27:00.)   The fact is undisputed.

28        [13] Plaintiff gives conflicting evidence as to the time he was escorted back to his cell.  (See Doc. 134-2, Ex.
2, Glass Decl., identified as p.0021 at ¶59; then see Id., identified as p. 0031 at ¶52.)

The Court disagrees. Defendants have not met their burden in establishing that defendant Dang is entitled to summary judgment. To the extent that the medical records suggest that defendant Dang did not treat Plaintiff following the April 17, 2002 incident, this evidence, if anything, is consistent with Plaintiff's claim that he was denied medical care by defendant Dr. Dang.

At issue is whether any such a denial occurred, and if so, whether it amounts to deliberate indifference. Was defendant Dr. Dang in fact working that night? Did he encounter Plaintiff there? Did he medically assess Plaintiff? If so, what were his findings? If not, why not? Was it his opinion that a further medical evaluation was unnecessary because he had been examined by M.T.A. Chacon and Dr. Raman? Based on the limited evidence submitted, the Court cannot determine what role, if any, defendant Dr. Dang played that evening in Plaintiff's care and cannot grant summary judgment.

### ii.    Medical Care Following the May 5, 2002 Incident

Defendants argue that Dr. Dang is also entitled to summary judgment on the claim of deliberate indifference arising after the May 5, 2002 incident.

Defendants contend that defendants Bailey and Case took Plaintiff down. (Doc. 95-3, Bailey Decl. ¶ 10; Doc. 95-8, Defs.' Ex. B 10, 13.) Sgt. Kraay summoned Psychiatric Technician R. Davis to perform a medical evaluation of Plaintiff. (UF 4.)   Plaintiff complained of pain to the left side of his face, both shoulders, his right ribs, both wrists, and his testicles. (UF 5.) M.T.A. Davis noted that Glass had no visual injuries and medically cleared Plaintiff. (Id.) Defendants contend that Plaintiff was placed in a holding cell in the Emergency Room area to await the arrival of a new escort team to take him to SHU.  Plaintiff contends that he was placed in the holding cell in the Emergency Room to see defendant Dr. Dang. (Doc. 134-2, Pl's Ex. 1, Comp, identified as p. 0007.)

Defendants argue that defendant Dr. Dang did not refuse to treat Plaintiff.  Defendants further argue that even if defendant Dr. Dang had refused to treat Plaintiff, there existed no need for treatment because Plaintiff had already been medically evaluated and cleared by M.T.A Davis. Therefore, Defendants contend that there was no deliberate indifference on the part of defendant Dr. Dang and that defendant Dr. Dang is also entitled to qualified immunity.

Again, the Court finds that Defendants have not met their burden.  First, there is no evidence

26

submitted by Defendants to support their assertion that defendant Dr. Dang did not refuse Plaintiff treatment. Defendants cite to records noting his refusal to treat defendant Officer Bailey. However, evidence that defendant Dr. Dang *did* refuse to treat defendant Bailey is not evidence that defendant Dr. Dang *did not* refuse to treat Plaintiff. In fact, there is no evidence outlining the extent of defendant Dang's participation following the May 5, 2002 incident.

We now turn to Defendants' argument that defendant Dr. Dang was not required to examine Plaintiff because Plaintiff was already cleared by M.T.A. Davis. Defendants do not cite to any evidence showing that Dr. Dang knew Plaintiff had been cleared by M.T.A Davis. The Court cannot find that defendant Dr. Dang responded appropriately if it is not clear what defendant Dr. Dang knew about Plaintiff's condition. Defendants fail to meet their burden and therefore Dr. Dang is not entitled to summary judgment nor qualified immunity.

### D.    Access to Courts

Plaintiff was placed on strip cell status on May 18, 2002. (Doc. 134-2, Ex. 1, Comp., ¶56.) On April 15, 2002, the United States Court of Appeals for the Ninth Circuit issued an order in Plaintiff's appeal bearing Appeal No. 01-17159. The Ninth Circuit revoked Plaintiff's in forma pauperis status and ordered Plaintiff to pay the $105.00 filing fee within twenty one days or the appeal would be dismissed. (Id., ¶57.) On May 20, 2002, the Ninth Circuit issued its final order dismissing Plaintiff's appeal for failure to comply with the court's order. (Id., ¶58.) Both orders were held by Defendants without Plaintiff's knowledge until May 25, 2002 when he came off strip cell status and received his mail. (Id., ¶59.) Plaintiff contends that defendants Botello, Beebe, Case, Bailey, Bryant, Lawton, Diaz and Tracy withheld his mail for 39 days, from April 17 to May 25, 2002, without his knowledge for the purpose of causing the dismissal of his appeal. (Id., ¶60.) Plaintiff contends that he could have easily paid the $105.00 filing fee had Defendants not withheld his mail. (Id.)

Inmates have a fundamental constitutional right of access to the courts. Lewis v. Casey, 518 U.S. 343, 346, 116 S.Ct. 2174, 2177 (1996). The right is limited to direct criminal appeals, habeas petitions, and civil rights actions. Id. at 354, 2181-82. Claims for denial of access to the courts may arise from the frustration or hindrance of "a litigating opportunity yet to be gained" (forward-looking

access claim) or from the loss of a meritorious suit that cannot now be tried (backward-looking claim).  Christopher v. Harbury, 536 U.S. 403, 412-15, 122 S.Ct. 2179, 2185-87 (2002).  For backward-looking claims such as that at issue here, Plaintiff "must show: 1) the loss of a 'nonfrivolous' or 'arguable' underlying claim; 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit." Phillips v. Hust, 477 F.3d 1070, 1076 (9th Cir. 2007).

The first element requires that Plaintiff show he suffered an "actual injury" by being shut out of court.  Harbury 536 U.S. at 415, 121 S.Ct. at 2187; Lewis, 518 U.S. at 351, 116 S.Ct. at 2180; Phillips, 477 F.3d at 1076.  The second element requires that plaintiff show defendant proximately caused the alleged violation of plaintiff's rights, "[t]he touchstone . . . [for which] is foreseeability." Phillips, 477 at 1077.  Finally, the third element requires that plaintiff show he has no other remedy than the relief available via *this* suit for denial of access to the courts.  Id. at 1078-79.

In their motion, Defendants first argue that they are entitled to summary judgment because the Ninth Circuit's May 15, 2002 order to Plaintiff was never received at Corcoran.  Because Plaintiff has submitted evidence suggesting that the mail was issued to him at Corcoran, the Court will not address this argument further.  (See Doc. 134-2, Ex. 2, Glass Decl., identified as p. 0026 at ¶9 (attesting that he was issued the orders from the Ninth Circuit on May 25, 2002); see also Doc. 134-2, Ex. 11, identified as p.0065 (showing mail received at CSP - Corcoran on May 14, 2002 and May 23, 2002 from Ninth Circuit).)

Nevertheless, the Court finds that Defendants are entitled to summary judgment on Plaintiff's access to the courts claim.  Defendants assert that once Plaintiff received the Ninth Circuit's order dismissing his appeal, he could have notified the Ninth Circuit about the circumstances, he could have requested that it reconsider its decision to dismiss the appeal, and he could have paid the filing fee. (Doc. 94, Defs' Motion for Summary Judgment p.31:19-22.)

Plaintiff's opposition is non-responsive to Defendants' arguments that he could have sought reconsideration after his strip cell status expired.  His appeal was dismissed for failure to prosecute by order issued May 20, 2002.  In 2002, pursuant to General Order 2.4, Plaintiff could have filed a motion for reinstatement of his appeal within twenty-eight days from the entry of the dismissal order.

(United States Court of Appeals for the Ninth Circuit, General Order 2.4.) Therefore, Plaintiff had a remedy available to address the denial of access other than the filing of the instant lawsuit. Plaintiff received the order dismissing his action in time to file a motion for reinstatement and he provides no explanation for his failure to do so. Therefore, the dismissal of Plaintiff's appeal, alone, is not sufficient to demonstrate the existence of an actual injury.

For the foregoing reasons, Defendants are entitled to judgment as a matter of law on Plaintiff's access to the courts claim.

### E.    Retaliation

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a section 1983 claim. Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005). An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support claim under section 1983. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).

### i.    April 17, 2002 Cell Extraction

Defendants argue that they are entitled to summary judgment on Plaintiff's claim of retaliation concerning the April 17, 2002 cell extraction. Defendants argue that they had a legitimate penological reason for employing a calculated cell extraction to gain control over a disruptive inmate who broke the rules by covering up his cell, initially refusing to uncover his cell, and then resisted and refused to follow lawful orders to cuff up and exit his cell.  Defendants argue that Plaintiff cannot bear his burden of showing no legitimate penological purpose.

In opposition, Plaintiff argues that defendant Lawton defied orders by assembling a cell extraction team after defendant Tracy had ordered him not to do so.  Therefore, Plaintiff contends that there was no legitimate penological purpose.

1    As discussed above, having reviewed the evidence in the light most favorable to Plaintiff,

2    the Court finds that the application of force was employed for the purpose of gaining Plaintiff's

3    compliance with prison staff orders.  Plaintiff's refusal to comply with the orders of Defendants to

4    cuff up, coupled with the fact that he created a barricade using his mattress, created a need for the

5    application of force to gain Plaintiff's compliance.  Therefore, despite Plaintiff's contentions that

6    he did not cover his windows or door, and that he did not intend to "gas" Defendants, the Court finds

7    that Defendants had a legitimate penological reason for employing a cell extraction once Plaintiff

8    refused to comply with staff orders.  In order to defeat summary judgment, Plaintiff bears the burden

9    of proving "that there were no legitimate correctional purposes motivating the actions he complains

10   of." Pratt, 65 F.3d at 808.   While Plaintiff has created a triable issue of fact as to whether the use

11   of force during the extraction was excessive, Plaintiff submits no evidence that Defendants were not

12   motivated by any penological purpose. The videotape evidence clearly shows Plaintiff barricading

13   his cell door and Plaintiff concedes doing so.  (Doc. 153, Videotape, 10:15:59.)   Plaintiff fails to

14   show a lack of penological purpose in the cell extraction, and Defendants are entitled to summary

15   judgment on this retaliation claim.

16                    **ii.    Placement on Strip Cell Status**

17       Plaintiff alleges that he was placed on strip cell status from April 18, 2002 to April 28, 2002,

18   and then again from May 5, 2002 to May 25, 2002.  Plaintiff alleges that Defendants did so to stop

19   him from litigating.  In support of summary judgment, Defendants argue that placing Plaintiff on

20   strip cell status and then extending that status was reasonably related to legitimate penological

21   interests.

22                 **a.    Initial Placement - April 18 to April 28, 2002**

23       Defendants argue that on April 18, 2002, Plaintiff was placed on strip cell status until April

24   28, 2002 because he had covered up his cell door and window on April 17, 2002. (Doc. 95-6, Diaz

25   Decl., ¶35). Defendants argue that Plaintiff's placement on strip cell status was in compliance with

26   OP 222, section 1006(4)(A), which requires that an inmate be placed on strip cell status if he has

27   breached institutional security by covering up his cell.  (Doc 95-9, Defs' Ex. D.)

28       Plaintiff has submitted evidence stating that he never covered his window and door and that

                                                    30

Defendants falsely accused him of doing so simply to have him placed on strip cell status.  (Doc. 134-2, Ex.1, Comp, identified as p.0004).  Plaintiff has created a triable issue of fact as to whether there existed a legitimate penological purpose behind his initial placement on strip cell status. Defendants are not entitled to summary judgment.

### b.        Placement Following May 5, 2002 Incident

Defendants contend that on May 5, 2002 defendant Tracy placed Plaintiff to strip cell status from May 6 - 16, 2002 because he resisted staff while under escort from the Mental Health Crisis Unit back to his assigned SHU unit by refusing to allow defendants Bailey and Case to apply leg restraints. (Doc. 95-8, Def's Ex. B 25, 026.)  Defendants argue that Plaintiff's placement on strip cell status was in accordance with OP 222 section 1006(3)(A), which permits putting inmates who have displayed a propensity for violence or other inappropriate behavior on strip cell status.

Plaintiff argues that he was placed on strip cell status by defendants Tracy and Lawton in order to withhold Plaintiff's legal mail and legal materials from him.  (Doc. 133, Pl's Opp., p.79.) Plaintiff has submitted evidence that he was attacked by defendants without provocation.  By implication, Plaintiff has created a triable issue of fact as to whether there existed a legitimate penological purpose for his return to strip cell status on May 5 or 6, 2002. Defendants are not entitled to summary judgment.

### c.        Extension of Strip Cell Status to May 24, 2002

Defendants submit evidence that while on strip cell status all property will be confiscated excluding one state-issued mattress, one state-issued pair of boxer shorts, one pair of shower shoes, and legal materials (upon verification of a pending legal deadline).  (Doc. 95-5, Tracy Decl., ¶9; Doc 95-9, Defs' Ex. D 0109.)

Defendants contend that Plaintiff's strip cell status was extended by defendant Tracy through May 24, 2002 because Plaintiff had state linens and clothing other than boxer shorts in his cell in violation of his strip cell status. (Doc. 95-5, Tracy Decl., ¶8.) Plaintiff was released from strip cell status on May 25, 2002.  (UF 11.)

In opposition, Plaintiff submits evidence that the only items he had in his cell that were confiscated were his medications, a copy of a Title 15 rules book, and papers. (Doc. 134-3, Pl's Ex.

17, identified as p. 0108; Doc. 134-4, Pl's Ex. 21, identified as p. 0176.)  Plaintiff attests that these items were issued by custody and medical staff and submits that the records of the cell search show that no clothing or linens were found in his cell.  (Doc. 134-2, Pl's Ex. 2, Glass Decl., identified as p. 0036).

Plaintiff's evidence shows that he was in possession of property that he was not permitted to have while on strip cell status.  Although he attests that these items were issued to him by custodial staff, Plaintiff submits no evidence showing that he was entitled to keep them in his cell. The evidence shows that the items were confiscated by correctional staff. (Doc. 134-3, Pl's Ex. 17, identified as p. 0108.)  Plaintiff's argument that the items are not accurately described by defendant Tracy in his declaration is unpersuasive and fails to show "that there were no legitimate correctional purposes motivating the actions he complains of." Pratt, 65 F.3d at 808.   There existed a legitimate correctional goal in extending Plaintiff's strip cell status.  Therefore, Defendants are entitled to summary judgment.

### d.    Denial of Medical Treatment by Defendant Dr. Dang

Defendants' motion for summary judgment on Plaintiff's retaliation claim against defendant Dr. Dang fails for the same reasons as discussed above for Plaintiff's Eighth Amendment claim against him.  (See Section III.C above.)

### F.    Damages Against State Officials in Their Official Capacities

The Eleventh Amendment bars damages actions against state officials in their official capacity. See Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997); Eaglesmith v. Ward, 73 F.3d 857, 859 (9th Cir. 1996); Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992).  For this reason, a damages claim against Defendants in their official capacities is not cognizable and must be dismissed from the action.

## IV.   Conclusion and Recommendations

For the reasons set forth herein, it is HEREBY RECOMMENDED that:

1.    Defendants' motion for summary judgment, filed December 27, 2006, be GRANTED IN PART and DENIED IN PART as follows:

a.    Defendant Tracy be granted summary judgment on the excessive force claim

against him arising from the April 17, 2002 cell extraction;

      b.     Defendants be granted summary judgment on Plaintiff's retaliation claim concerning the April 17, 2002 cell extraction;

      c.     Defendant Lawton be granted summary judgment on the excessive force claim against him arising from the May 5, 2002 use of force incident;

      d.     Defendants be granted summary judgment on Plaintiff's denial of access to the courts claim;

      e.     Defendants be granted summary judgment on Plaintiff's retaliation claim concerning his initial placement on strip cell status from April 18, 2002 to April 28, 2002, and his continued placement from May 13, 2002 to May 24, 2002;

      f.     Defendants be granted summary judgment on Plaintiff's claim for damages against Defendants in their official capacities;

      g.     The remainder of Defendants' motion for summary judgment be denied; and

   2.     This matter be set for jury trial.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **August 19, 2009**                    _____ **/s/ Dennis L. Beck** _____
                                          UNITED STATES MAGISTRATE JUDGE